Alexander Del Giorno, J.
On or about March 6, 1958, the State, by the Department of Mental Hygiene, entered into a contract with the claimant corporation for the construction of *765 “ Continued Treatment and Disturbed Patients’ Building, Building No. 105, Manhattan State Hospital, Ward’s Island, New York, pursuant to the State Architect’s Standard Construction Specifications of November 1, 1955, and in accordance with Specification No. 8585-C, etc.” The work was to commence promptly and was to be completed on or before September 1, 1960, for the agreed sum of $6,359,000.
The work was performed and the job completed and officially accepted by the State on August 25, 1961. The final estimate was prepared by the State, upon which a check for the balance indicated therein to be due to the claimant was sent to the claimant, which the claimant rejected, claiming that it was not representative of all that was still due to it. As a result thereof, the present claim was filed.
Thereafter, this court was moved for an order severing from the said claim that portion thereof relating to the moneys concededly due to the claimant for the balance of the amount certified as earned under the contract and, by order entered September 28, 1961, said motion was granted, awarding to the claimant the sum of $322,577.46, which represented moneys concededly due to the claimant for the balance of the amount certified as earned in the final estimate and, at the same time, reserving the question of interest thereupon to be determined at the present trial of the remainder of the claim.
The present claim may be divided under three captions:
Stairway “A”
Screeds
Bock Excavation
The court finds that with regard to its claim for furnishing a reinforced concrete floor and a steel beam under the stairway in the basement of the building the claimant is entitled to only $56 it paid for No. 5 rods instead of No. 3 rods.
It seems to the court that the claimant has chosen to read only Drawing 57/135, when each and every sheet of the plans should have been considered. Sheet 57/127 indicates clearly that a concrete slab and a steel beam were required at the bottom of Stairway “ A ”. This requirement is clearly set out, except that it did not specify any reinforcing rods. The court allows a 15% over-all profit on the $56, making a total award of $64.40.
We shall now consider the issue as to whether screeds were required by the contract. The court finds in favor of the claimant. The court finds that the pertinent portion of article 2011 of the State Architect’s Standard Construction Specifications which the State inserted in amendment to section 20 in the *766 contract itself, states: “ Provide screeds at top of sub-base where rubber base is installed against plaster or masonry.” The court interprets the above to require the use of screeds where the base would be flat or flush from the floor up, even if a flat base element other than rubber were used. In this contract, however, the base required was a terrazzo splayed base, better known as hospital type base. This type base is installed as a continuation of the terrazzo floor itself, upwards against the wall, and it is made concave at the juncture of the floor and the wall. The court does not believe that it is subject to the conditions article 2011 above mentioned. However, whether or not it might be affected by the provisions of article 2011, such assumption would seem to be negated by claimant’s Exhibit No. 12, which is a letter dated December 22, 1959, written by the State Architect to the claimant herein, in reply to objections raised by the claimant to an order requiring the installation of screeds. The letter concedes that ‘ ‘ the lathing subcontractor is correct and the specification inadvertently neglected to specify a screed under this section at the top of this hospital type base. ’ ’ The letter then attempted to justify the demand of the State for the installation of screeds without additional charge to the State.
From all the testimony and evidence, the court finds that said demand by the State was at variance with the specifications and the plans for the erection of the building, and interprets the admission of the Architect as being not so much an inadvertent neglect to specify “ screed ” but, rather, a cover to demand additional work from the claimant without payment therefor.
The court finds that the claimant is entitled to the sum of $6,930 for the screeds, which includes the cost to claimant plus profit and overhead.
The last cause of action involves the dispute which arose concerning the rock excavation. With regard to this claim, the court finds it necessary to set out the paragraph entitled ‘ ‘ SubSurface Data ” contained in the contract: “ Test holes have been drilled on the site, at locations shown on the Plot Plan drawing. The test hole data shown on the plans are not guaranteed by the State in any respect, nor represented by it as being worthy of reliance. They are made available to the Bidders, who shall make their own independent determination as to what value to assign to them. The State makes them available as information in its possession without intent or attempt to induce the Bidders to rely thereon.”
The court finds that the above paragraph is confusing, illogical, contradictory and even deceptive. It seems to have been *767 drawn with the thought in mind of permitting easy escape on the part of the State from its own prime responsibility to present to the prospective bidders as complete and efficient information concerning the substrata of the situs as modern techniques and machinery make possible.
The court finds that the State was haphazard in the manner in which it took the borings.
The court finds it difficult to accept the rationale adopted by the State whereby, on one hand, it describes its borings as unworthy of reliance and, on the other hand, it makes its analysis thereof the very foundation for the claimant’s bid.
An abbreviated analysis of this confusing process may prove of value in our quest to understand what to the court seems to be a contradictory exposition of the State’s policy in its dealings with bidders. In the first instance, the State makes the borings. It then represents such borings to be unworthy of reliance. From these same “ unworthy of reliance” borings the State prepares its estimate of the amount of rock excavation and pier and trench excavation to be expected on the job site. The contractor then is required to base its bid upon such estimate. The bid firms the contract with the State. There is neither time nor opportunity to permit, nor a moral right on the part of the State to demand, independent borings by the contractor prior to the acceptance of its bid. By the very nature of its own methods of public bidding, the State makes its borings the sine qua non of the bid, while at the same time, the State proclaims, without blushing, that its borings are unworthy of reliance and are submitted merely as information in its possession.
What are we to deduce from this self-serving, contradictory shield raised by the State in its public contracts? Should we agree with the State, we would have to determine that the proposed bidder would have to make his own borings in preparation for his bid. However, one may inquire, “ Where is that provided in the Bid Notice? ” and, if it were provided, who would spend, perhaps, thousands of dollars for preliminary borings without knowing whether he would even receive the contract? If this sort of cat and mouse game were to be confirmed by the courts, very few contracts would ever be bid upon, to the very detriment of the State. Now, more than ever, when the State is engaged in the great development of its resources and facilities for the benefit of the public, it becomes more necessary that it set before its citizens a pattern of fair dealing by eliminating uncertainties from its contracts which would make for confidence and mutual trust and might, in the *768 end, save endless disputes as well as great sums of money for the State.
. In addition to the above provisions of the contract, and in furtherance of the claimant’s contention, the State’s own witnesses conceded that the borings were insufficient and not generally related to the situs in which the building was to be erected. The State’s experts at the trial testified that the subject borings were made in 1957 and represented merely average borings for a given area. Yet, when asked by the court, the State’s soils engineer indicated to the court that if such borings had been made at the locations where the footings of this great hospital building were to rest the State would have known the exact subsurface conditions, possibly avoiding the necessity for this claim because of its ability to have then estimated correctly the subsurface data.
The facts, which speak louder than words, indicate how wrong the State was in the manner in which its borings were taken and its estimates prepared. During the trial, the State also stipulated with the claimant that, according to the contract, it had been estimated that there would have been a general rock excavation of 500 cubic yards and a trench and pier excavation of about 600 cubic yards, or a total of 1,100 cubic yards; that, actually, there were dug 2,982 cubic yards of general rock and trench and pier rock, both sides disagreeing only as to how much was general rock and how much was trench and pier excavation. The claimant asserted that, of the additional excavation, 275 cubic yards belonged in general rock excavation and the remainder belonged in trench and pier excavation.
To further indicate how haphazardly these borings seem to have been taken, it was disclosed at the trial that there were 216 pier footings, of which 78 required excavation into rock of less than 2 feet below the surface, 71 of 2 to 4 feet below the surface, 40 of 4 to 6 feet below the surface, 17 of 6 to 8 feet below the surface, 7 of 8 to 10 feet below the surface and 3 of 10 plus feet below the surface. The State did not deny this disparity in the conditions of the subsurface, nor that the subcontractor doing this excavating had expected to complete his job in about two months, whereas the extra excavation extended the job to almost five months, bringing the extra work into Winter weather.
The subcontractor testified that, because of the conditions which compelled him to dig so much lower, it was necessary to use jackhammers rather than cranes or explosives, that he had to triple his working force, that thousands of feet of air and *769 water hoses were required to keep floods from the construction area and that Winter weather impeded the work.
Nevertheless, despite its reliance upon the “boring” provisions of the contract at the trial, the State accepted its responsibility for the extra work, except that the State would agree to pay the contractor on the basis of unit prices provided generally in the contract for such work. On the other hand, the subcontractor as well as the contractor say that this was a job outside the contemplation of the contract and of such extraordinary and difficult proportions that they can only be compensated by charging therefor for the extra rock excavation in accordance with the market rate and in accordance with the expenses they incurred over and above the unit rate.
The court agrees with the claimant and finds that this was not additional work under the terms of the contract, but that it was work outside of any reasonable contemplation at the time of the contract. The State, by its own actions, caused the extraordinary conditions to arise and the claimant is entitled to be reimbursed fairly outside the general provisions of the contract. In the award to be made herein, the court will give due credit to the State for the concession made by claimant that an overrun of 10% over the estimated quantities would be reasonable to expect when dealing with subsurface estimates.
Acceding to a general requirement of this court to shorten this type of actions, the State engaged the services of a professional accountant. His duty was to examine the claimant’s books, verify each item involved, totalize the said items in each category of the claimed extras, and present to the court a simplified reflection of the quantum involved in the claim, leaving to the court the problem of liability. The court finds, however, that this audit was deficient and inaccurate and disregards it. It was only a partial audit, directed to rock excavation only. The accountant admitted that he did not figure out profits which should have been included on rock excavation; he did not consider the admitted use of the jackhammers, air pumps, supervisory personnel, increased labor force, hauling, equipment, etc., which were used to do the extra work.
Had not the witness testified that his assignment was a restricted assignment directed only to rock excavation (which the court believes the witness misunderstood), without power of inquiry as to how it was accomplished, or fair analysis of the cost in men, equipment and materials used, the court would find this presentation an appalling imposition upon the court and the litigants.
*770 In addition to the claimant’s own concession that a 10% overrun may be expected from the subsurface excavations, the court, from all the testimony, believes that a portion of the time claimed for personnel and equipment may not be credited to the extra work for rock excavation. The court is of the opinion that the gross claim of $160,240.49 should be reduced to the sum of $135,000 which represents a fair charge for the rock excavation. From this amount the State is to be credited with the sum of $47,287, admittedly paid to the claimant, thus reducing the award for rock excavation to $87,713.
The court awards to the claimant on the claim proper the following sums:
For Stairway “A”..... $64.40
For Screeds ............ 6,930.00
For Bock Excavation .... 87,713.00
for a Total of...... $94,707.40
with interest thereon from August 25, 1961 to the date of entry of judgment.
The claimant is also entitled to interest on the severed action from August 25, 1961 to September 28, 1961, which amounts to the sum of $1,201.90 and to interest on the said $1,201.90 from September 28, 1961 to the date of entry of judgment herein.